UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 00-215 (DSD/JMM)

Pamela M. Angier,

Plaintiff,

v.

**ORDER**

William J. Henderson,
Postmaster General, United
States Postal Service,

Defendants.

Mary Jo Madigan, Esq. U.S. Attorney's Office, 600 U.S. Courthouse, 300 Fourth Street South, Minneapolis, MN 55415, counsel for plaintiff.

Michael Mobley, Esq., Mobley Law office, 701 Fourth Avenue South, Suite 500, Minneapolis, MN 55415, counsel for defendants.

This matter is before the court on defendants' motion to dismiss or in the alternative for summary judgment. Based on a review of the file, record, and proceedings herein, the court grants defendants' motion in part and denies defendants' motion in part.

**BACKGROUND**

Plaintiff Pamela M. Angier ("Angier") sues her former employers, defendants William J. Henderson, Postmaster General, and the United States Postal Service (collectively referred to here as

FILED 8-3-01
FRANCIS E. DOSAL, CLERK
Judgment Ent'd. ______
Deputy Clerk's Initials ______

the "Postal Service" or "defendants"), for sexual harassment, constructive discharge and discrimination under the Rehabilitation Act, 29 U.S.C. § 794.

Angier began her employment with the Postal Service in 1969. During her 29-year career, she worked in various clerk positions. In June 1994, Angier was assigned to defendants' Claims and Inquiry Unit. Angier asserts in this lawsuit that from the beginning of her assignment to this unit, her coworkers subjected her to sexual harassment and discriminated against her based on the fact that she suffered from depression. She complained to three of the seven direct supervisors assigned to her unit from June 1994 through August 1997, but claims that none of her complaints brought the harassment to an end.[1]

On August 20, 1997, Angier sought and was granted a medical leave of absence. Despite receiving ongoing medical care for stress and depression, Angier concluded that she could not return to the Postal Service. She resigned from her position with the Postal Service on May 18, 1998, and in her resignation letter she asserted her belief that she had been constructively discharged. Eight days later, on May 26, 1998, Angier filed a complaint with an

---

[1] Angier made additional work-related complaints to a fourth supervisor, but the evidence in this case indicates that her complaints were not specific to sexual harassment or disability discrimination and related more generally to her perceived poor relations with her coworkers. (Angier dep. at 95; Granos Decl. at ¶¶ 2,3).

Equal Employment Opportunity counselor. On November 1, 1999, the Postal Service issued its final agency decision on Angier's complaint and on January 27, 2000, Angier filed this lawsuit. Defendants now move for an order dismissing this action for failure to state a claim upon which relief may be granted, or in the alternative for an order granting summary judgment.

**DISCUSSION**

Rule 12 of the Federal Rules of Civil Procedure provides that a party may move to dismiss a complaint on various grounds, including failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In considering a Rule 12(b)(6) motion to dismiss, the court takes all facts alleged in plaintiff's complaint as true. Westcott v. City of Omaha, 901 F.2d 1486, 1488 (8th Cir. 1990). In addition, the court must construe the allegations in the complaint and all reasonable inferences arising from the complaint in the light most favorable to the plaintiff. Morton v. Becker, 793 F.2d 185, 187 (8th Cir. 1986).

When matters outside the pleadings are presented on a Rule 12(b)(6) motion and are not excluded by the court, the court must convert the motion to one for summary judgment. See Fed. R. Civ. P. 12(b)(6); Hamm v. Rhone-Poulenc Rorer Pharm., Inc., 187 F.3d 941, 948 (8th Cir. 1999). In this case, the parties have submitted deposition transcripts, declarations, medical records and other

materials to support their arguments. The court finds it proper at this advanced stage in the litigation to rely on these additional documents in making its determination, therefore defendants' motion will be treated as a motion for summary judgment under Fed. R. Civ. P. 56.

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating to the court that no genuine issue of material fact exists. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A fact is material only when its resolution affects the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 250.

On a motion for summary judgment, the court views the evidence in a light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences without assessing credibility. See Miller v. National Cas. Co., 61 F.3d 627, 628 (8th Cir. 1995). However, the nonmoving party may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. Moreover, if a party cannot support each essential element of its claim, summary judgment must be granted

because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. See id. at 322-23. With this standard at hand, the court considers defendants' motion for summary judgment.

**I. Sexual harassment**

Title VII forbids sexual harassment in the workplace and imposes liability upon employers who tolerate a hostile work environment. Meritor Sav. Bank v. Vinson, 477 U.S. 57, 66 (1986). A plaintiff asserting a hostile work environment claim must show that: (1) she belongs to a protected group or class, (2) she has endured unwelcome sexual harassment, (3) the harassment was based upon gender, (4) the harassment affected a term, condition, or privilege of employment, and (5) her employer knew or should have known about the harassment and failed to take proper remedial action. Kopp v. Samaritan Health Sys., Inc., 13 F.3d 264, 269 (8th Cir. 1993). Harassment affects a term, condition, or privilege of employment if it is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor, 477 U.S. at 67).

There is no dispute that Angier is a member of a protected group. However, the court notes that some of the behavior about which she complains does not satisfy the requirement that the offensive conduct be gender-based. For example, Angier complains

that she was forced to work in an environment where her male and female coworkers repeatedly used profanity, including "fuck", "shit", "bitch" and "asshole." (Nowacki dep. at 25; Hansen dep. at 45.) Although gender-based profanity, such as use of the word "bitch," may create an inference of discrimination based on sex, Carter v. Chrysler Corp., 173 F.3d 693, 700 (8th Cir. 1999), Angier indicates that she was addressed in this manner only one time, by a former coworker outside of the Claims and Inquiry Unit. (Angier dep. at 67.) Her primary complaint with respect to profanity appears to be the frequent generalized use in her unit of gender-neutral profanity, especially when customers were within earshot. (Angier dep. at 68-70.) The use of such language by both male and female employees in front of both male and female coworkers is not discrimination based on sex. Hocevar v. Purdue Frederick Co., 223 F.3d 721, 737 (8th Cir. 2000). In short, as it has been repeatedly emphasized, Title VII prohibits sexual discrimination, but it is not a "general civility code." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998).

However, Angier also complains among other things that her male coworkers touched her hair, attempted to touch her breasts, propositioned her, subjected her to tales of their sexual exploits, joined in tandem to physically block her from moving about the workplace and viewed and discussed pornographic magazines in the workplace. A reasonable factfinder could conclude that she would

not have been subjected to much of this conduct if she were a man. Kopp, 13 F.3d at 269-70 (evidence that members of one sex were the primary targets of the harassment is sufficient to show that the conduct was gender-based for purposes of summary judgment).

Having determined which conduct is actionable under the gender-based prong of the statute, the court must also determine whether the alleged illegal conduct was sufficiently severe or pervasive to affect Angier's work performance. The court may consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. Further, there must be evidence that the employee subjectively perceives the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable. Oncale, 523 U.S. at 81-82.

Angier complains that during her initial one-week training period in the Claims and Inquiry Unit in July 1994, Elmer Pulscher, the man assigned to train her, intruded upon her personal space, attempted to rub his elbows against her breasts, commented on her physical appearance, propositioned her, inquired as to her sexual preferences, played with her hair and placed a cartoon on her desk depicting a woman posed in a seductive position. (Angier dep. at

50-54). Pulscher also allegedly spread his legs while seated, placed his hand on his belt buckle and raised his pelvis while smiling wryly at Angier. (Id. at 57.)

Angier also complains that in the fall of 1995, Pulscher handed Angier a newspaper article about four men who died after ingesting an alleged aphrodisiac. (Id. at 62.) Also in the fall of 1995, coworker Michael Hansen allegedly subjected Angier to comments regarding his sexual exploits, including on-the-job sexual experiences with married female customers. (Id. at 58.) In addition, Angier also overheard him discussing his visits to pick-up bars and strip shows. (Id. at 60-61; Mobley Aff. Exh. 10.) Sixteen months later, in the spring of 1997, Hansen and Pulscher attempted on at least three separate occasions to block her path as she moved around the office. (Angier dep. at 72; Mobley Aff. Exh. 10.) She also discovered that someone had placed spittle on the receiver of her telephone, (Angier dep. at 70-71) and in a separate incident, someone attached a photograph of a man defecating in the woods to her workstation (id. at 59).

Further evidence provided by Angier indicates that a postal employee from another unit was regularly dropping off undeliverable pornographic magazines to Hansen and coworker Willard Goetz, who kept the magazines in their desks and viewed and discussed them together during work hours. (Goetz dep. p. 41, 43; Hansen dep. 52, 56-57.) Angier alleges she had to endure their workplace

commentary about the pornographic photographs. In particular, Angier recalls hearing Goetz ask Hansen if "Gary" had "brought them anything." When Hansen replied "yes", Goetz asked if it was "fresh," to which Hansen responded "well . . .there are no pages stuck together." (Angier dep. at 81.) Finally, Angier notes her discovery of a sexually explicit handout in an office filing cabinet to which she had access. (Id. at 90-93.) There is no indication in the record that Angier ever participated in or encouraged any of this sexually explicit conduct or workplace banter.

Defendants contend that the comments and gestures of which Angier complains were isolated incidents, stretched over a period of three years. Defendants also note that many of the challenged comments were primarily overheard by Angier rather than directed at her. As such, defendants argue that the alleged illegal behavior was neither frequent enough nor severe enough to be actionable under Title VII. The court notes first that offensive comments need not be directed at a plaintiff in order to constitute conduct violating Title VII. See Black v. Zaring Homes, Inc., 104 F.3d 822, 826 (6th Cir. 1997) (citing Harris, 510 U.S. at 21-22, 114 S.Ct. 367).[2] Moreover, the Eighth Circuit has directed that in

[2] On this point, the court also notes that Angier complained to her supervisors that in March 1997, two of her coworkers, including alleged harasser Michael Hansen, made derogatory comments in her presence about a disabled Native American coworker. The comments included such terms as "fucking Indian" and "Hopalong

reviewing a hostile work environment claim, "the district court should not carve the work environment into a series of discrete incidents and then measure the harm occurring in each episode." Burns v. McGregor Elec. Indus., Inc., 955 F.2d 559, 564 (8th Cir. 1992). Rather, the court has an obligation to examine the totality of circumstances. Id. at 965. As the Third Circuit has phrased it, "[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir. 1990).

The court agrees with defendants that in this case, a reasonable jury might conclude that the conduct to which Angier was subjected constitutes the sort of "low-level harassment" which, at least according to the Seventh Circuit, is not actionable under Title VII. See Gleason v. Mesirow Finan., Inc., 118 F.3d 1134, 1143 (7th Cir. 1997)(citing Baskerville v. Culligan Int'l. Co., 50 F.3d 428 (7th Cir. 1995). However, after careful consideration of

---

Cassidy." (Mobley Aff. Exh. 10; Angier dep. at 73-74.) These workplace comments do not evince a generalized hostility toward women. However,"[b]ecause the crucial inquiry focuses on the nature of the workplace environment as a whole, a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim. Cruz v. Coach Stores, Inc., 202 F.3d 560, (2nd Cir. 2000); see also Schwapp v. Town of Avon, 118 F.3d 106, 111-12 (2nd Cir. 1997) (finding that harassment of other minorities was relevant to whether a black police officer experienced an abusive working environment).

the totality of circumstances in this case, the court believes that a reasonable jury might also conclude that the unremediated combination of physical gestures and intimidation, together with the direct propositions and inquiries and the ongoing indiscrete sexual bantering were sufficiently pervasive and severe to affect Angier's work performance. Accordingly, the court determines that Angier has met her burden with respect to this element.

Defendants also contend that Angier's sexual harassment claim must fail because when Angier complained to her supervisors, prompt remedial action was taken. Again, the court disagrees with defendants' conclusions. The evidence in this case indicates that over the course of three years, Angier complained about the conduct of her coworkers to three different supervisors. In 1994, Susan Brandt contacted the EEO office for advice on how to handle Angier's complaints. She then interviewed each of the members of the unit about Angier's allegations of sexual harassment and found that Angier's coworkers reportedly were "astounded by the allegations." (Mobley Aff. Exh. 10 at 5-6.) Brandt "found no evidence" of sexual harassment against Angier, therefore she concluded that "a service talk" on sexual harassment prevention would be sufficient. (Id.)

In 1997, Peter Nowacki confronted Angier's coworkers about her complaints of discriminatory conduct and like Brandt, he responded to their denials with a general admonition that harassing conduct, including possession and discussion of pornographic materials,

would not be tolerated. He also requested a workplace evaluation by defendants' Employee & Workplace Intervention Analyst. (Id.) Two months later, Ray Dehler became Angier's supervisor and when he became aware of her ongoing complaints regarding the pornographic materials, he interviewed Hansen and Goetz and advised them that such materials "do not belong in the workplace." (Dehler dep. p. 32.)

Although it would appear when viewed in isolation that each supervisor responded to Angier's concerns, there is no evidence that any of the complaints or investigations were documented in the personnel files of Pulscher, Goetz or Hansen. As a result, there was no record that prior complaints had been lodged against these men, and with each new supervisor, Angier was forced to start anew in her efforts to persuade her employer that her complaints were well-founded. No disciplinary action was ever taken against Pulscher, Goetz or Hansen.

Where an employer has knowledge of sexual harassment, taking "proper remedial action" means that the employer promptly takes steps "reasonably calculated to end the harassment." Barrett v. Omaha Nat'l Bank, 726 F.2d 424, 427 (8th Cir. 1984), quoting Katz v. Dole, 709 F.2d 251, 256 (4th Cir. 1983). Factors to be considered include the amount of time that elapses between the notice of the harassment and the remedial action, the options available to the employer, disciplinary actions taken against the offending employees including reprimands in personnel files and

whether the actions taken ended the harassment. Stuart v. General Motors Corp., 217 F.3d 621, 633 (8th Cir. 2000). In this case, a reasonable jury could conclude on the evidence provided that defendants failed to take reasonable steps to address Angier's complaints and bring the offensive conduct to an end. Therefore, based on the court's conclusions that plaintiff has met her burden of proof on the elements of her sexual harassment claim, defendants' motion for summary judgment as to this claim is denied.

**II. Constructive discharge**

Constructive discharge occurs when an employer "deliberately renders the employee's working conditions intolerable and thus forces the employee to quit [her] job." Allen v. Bridgestone/Firestone, Inc., 81 F.3d 793, 796 (8th Cir. 1996) (quoting Johnson v. Bunny Bread Co., 646 F.2d 1250, 1256 (8th Cir. 1981)). The plaintiff must show that a reasonable person in her situation would find the working conditions intolerable. Allen, 81 F.3d at 796. In other words, the intolerability of working conditions is judged by an objective standard, not the plaintiff's subjective feelings. West v. Marion Merrell Dow, Inc., 54 F.3d 493, 497 (8th Cir. 1995). Further, an employee who quits without giving her employer a reasonable chance to work out a problem is not constructively discharged. Id. at 498.

A plaintiff must show more than just a Title VII violation by her employer in order to prove that she has been constructively discharged. Tidwell v. Meyer's Bakeries, Inc., 93 F.3d 490, 495

(8th Cir. 1996). In this case, where Angier was subjected to repeated instances of harassing conduct over a span of three years, yet multiple supervisors were unable to bring about any meaningful change in the offensive tenor of the workplace environment, Angier has provided sufficient evidence upon which a reasonable juror could conclude that Angier's working conditions had become so intolerable that she had no choice but to resign her position. The fact that Angier took eight months of medical leave before reaching this conclusion herself does not prevent her from claiming that she was constructively discharged. See Nicolaisen v. Chicago & Northwestern Trans. Co., 1991 WL 237619 at *6 (D. Kan. Oct. 30, 1991) ("The fact that plaintiff was on medical leave of absence prior to taking retirement does not prevent her from bringing a claim of constructive discharge.").[3] Nor does it render Angier's

---

[3] In Katz v. Beth Israel Med. Ctr., 2001 WL 11064 (S.D.N.Y. Jan. 4, 2001), the district court dismissed a constructive discharge claim where plaintiff had been out on leave for five months before tendering her resignation. The court found that "[t]he fact that a plaintiff had been out on leave for a time prior to her resignation makes it less likely that the resignation was prompted by an atmosphere so intolerable that a reasonable person would have felt compelled to resign." Id. at *12. This court shares in that intuitive concern, where, in this case, Angier did not resign until eight months after the last act of harassment and one month after opening a new business for herself. (Angier dep. p. 113.) However, unlike the plaintiff in Katz, Angier clearly expressed in her resignation letter that she viewed her resignation "as being constructive discharge from her employment" due to many years of workplace harassment and her psychotherapy records support that subjective assertion. (Angier dep. Exh. 14; Mobley Aff. Exh. 8.) Cf. Katz, 2000 WL 11064 at *12 (relying in part on the absence of any mention of discrimination or mistreatment in her resignation letter.) Moreover, the court is reminded that when analyzing the merits of a constructive discharge claim, the factfinder does not

EEO complaint and subsequent lawsuit time-barred. See Doc. No. 11, 5/24/00 Order on Mot. to Dismiss; see also Flaherty v. Metromail Corp., 235 F.3d 133, 138-39 (2nd Cir. 2000). Accordingly, defendants' motion as to this claim is denied.

### III. Disability discrimination

In Count II of her complaint, Angier asserts that defendants refused to accommodate her claimed disability of depression and post traumatic stress disorder, in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 794. To invoke the protection of the Rehabilitation Act, a plaintiff must establish that: (1) she is an individual with a disability; (2) she is qualified to perform the essential functions of her job with or without a reasonable accommodation; and (3) she has been adversely treated solely because of her disability. Weber v. Strippit, Inc., 186 F.3d 907, 912 (8th Cir. 1999) (setting forth the elements to obtain relief under the Americans with Disabilities Act).[4] To show that she is disabled, a plaintiff must show that she has an impairment which

---

evaluate the workplace from the subjective viewpoint of the plaintiff. Rather, the factfinder must view the circumstances from an objective viewpoint, that is determine whether a reasonable person would conclude that the conditions were so intolerable as to require resignation. See West, 54 F.3d at 497 (holding that the employee's working conditions are evaluated under an objective standard). Therefore, evidence regarding when the plaintiff herself concludes that she must resign, while relevant, should not be overvalued.

[4] Disability analysis under the Rehabilitation Act mirrors the analysis under the Americans with Disabilities Act. Heintzelman v. Runyon, 120 F.3d 143, 145 n.4 (8th Cir. 1997).

substantially limits a major life activity. Heintzelman v. Runyon, 120 F.3d 143, 145 (8th Cir. 1997).

In this case, Angier's prima facie case fails because she has presented no evidence to support that she is disabled. She is not impaired in her ability to conduct major life activities, such as caring for herself, performing manual tasks, walking, seeing, hearing, speaking or breathing. Weber, 186 F.3d at 912-13. Moreover, there is no evidence that Angier suffers from a long-term inability to work. In January of 1996, Angier's psychiatrist Dr. Jan Apple indicated that she could not support lengthy disability leave because she believed Angier's "problems at work seem to be separate from a 'medical problem.'" (Mobley Aff. Exh. 8; Angier dep. at 107-110.) In June 1997, another psychiatrist, Dr. Joanne Hofstrand encouraged Angier to look for "other work options." (Mobley Aff. Exh. 8.)

Although Angier's depression worsened to the point that Dr. Hofstrand recommended that Angier take a medical leave of absence from her position with the Postal Service, there is no indication that Dr. Hofstrand considered the condition permanent. (Mobley Aff. Exh. 8.) Subsequent therapy records indicate that Angier not only believed she was able to resume work but did resume work and also opened her own retail gift shop in April 1998. (Id.; Angier dep. at 111.) Because statutory disability requires permanent or long-term limitations, this evidence of Angier's employability undercuts her claim that she qualifies for protection under the

Rehabilitation Act. 29 C.F.R. app. § 1630.2(j) ("temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities").

Even if Angier were able to prove that she suffers from a psychological impairment that substantially limits a major life activity, she cannot establish that she was adversely treated by Postal Service solely because of that condition. Her allegation that she was denied sick leave and other benefits for days that she missed work is not supported by the record in this case. In April of 1997, when Peter Nowacki questioned Angier about her tardiness and absenteeism, he learned for the first time that Angier had been diagnosed with depression and was taking medication which impacted her ability to get up in the morning. (Nowacki dep. at 45, 50-52; Angier dep. at 95-97.) Nowacki gave Angier the option to make up the missed hours or take sick leave or leave without pay to cover the missed hours. (Nowacki dep. at 52-53.) On July 15, 1997, Dr. Hofstrand requested that Angier be allowed to change her work shift to start later in the day and to come in later as needed. (Angier dep. Exh. 4.) On July 30, 1997, the request for accommodation was granted and Angier's work schedule was changed from 8:00 a.m. to 4:50 p.m. to 10:00 a.m. to 6:50 p.m. (Longie Decl.; Angier dep. at 89.) No reasonable juror would conclude on this record that defendants failed to accommodate an alleged disability. Therefore, the court grants summary judgment as to Angier's claim of disability discrimination under the Rehabilitation Act.

**CONCLUSION**

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. Defendants' motion to dismiss or for summary judgment is granted in part and denied in part.

2. Plaintiff's claim that she was discriminated against based on an alleged disability (Count II) is dismissed with prejudice.

3. Plaintiff's claims of sexual harassment and constructive discharge (Count I) remain viable for consideration by the jury.

Dated: August 3, 2001

David S. Doty, Judge
United States District Court

# Please forward this announcement to the recipient of this fax.

# The United States District Court, District of Minnesota announces two new programs!

**Expedited Trials** –The Court will begin offering parties an opportunity to participate in a program called Expedited Trials beginning July 2, 2001. This voluntary program offers an alternative to traditional case processing by allowing for a shorter time period from filing to disposition. Discovery and motion practice will be sharply limited as a means to reduce time and expense. Procedural rules are on the Court's website at www.mnd.uscourts.gov. If you would like additional information about the Expedited Trials Program, contact one of our clerk's offices at the phone numbers listed below.

**Courtroom Technology – Phase II** – In June 2001, the District of Minnesota began upgrading, installing, and enhancing the technology available to counsel in the courtroom. The project will continue through early fall and will ultimately upgrade all Article III Judge courtrooms in St. Paul and Minneapolis. To assist counsel with this transition, the District Court is offering a hands-on class, worth one hour of CLE credit at both courthouses. Classes will be held over the lunch hour. Course registration can be done by visiting www.mnd.uscourts.gov or by calling Kristine at 612-664-5125.

## For additional information on either program please visit our website at www.mnd.uscourts.gov.

700 Federal Building
316 North Robert Street
St. Paul, MN 55101
(651) 848-1100

202 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5000

417 U. S. Courthouse
515 West First Street
Duluth, MN 55802
(218) 529-3500